Filed 1/11/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| NICHELLE DUFFEY,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>TENDER HEART HOME CARE<br>AGENCY, LLC,<br><br>        Defendant and Respondent. | A152535<br><br>(Contra Costa County<br>Super. Ct. No. MSC15-02271) |

Plaintiff Nichelle Duffey (Plaintiff) sued defendant Tender Heart Home Care Agency, LLC (Tender Heart) for, among other claims, failure to pay overtime wages under the Domestic Worker Bill of Rights (Labor Code, §§ 1450 et seq.; DWBR),[1] which requires that domestic work employees receive overtime wages for all hours worked more than nine hours per day or 45 hours per week.  The trial court granted Tender Heart's motion for summary adjudication on the DWBR cause of action, finding the undisputed facts demonstrated Plaintiff was an independent contractor rather than an employee of Tender Heart for purposes of the DWBR.  We first conclude the trial court erred in exclusively applying the so-called "common law" test set forth in *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 (*Borello*), to determine the issue.  We next conclude that, under the appropriate tests, there is a dispute of fact as to whether Plaintiff was Tender Heart's employee.  Accordingly, we reverse and remand.

---

[1] All undesignated section references are to the Labor Code.

FACTUAL BACKGROUND

In 2011, Plaintiff signed a form contract with Tender Heart titled "Professional Caregiver Agreement" (the Caregiver Contract). The Caregiver Contract states that Tender Heart "is a caregiver placement agency whose business is to obtain contracts for caregivers in dwellings and to refer by subcontract such contracts to professional independent caregivers." The Caregiver Contract further states Plaintiff is "an independent contractor" and "an independent domestic worker, who is in the business of providing care giving services in dwellings and hereby solicits such contract for services from [Tender Heart]." Tender Heart also enters into contracts with clients.[2] Its standard client contract (the Client Contract) provides that Tender Heart "is engaged in the business of qualifying, screening and referring caregivers," and "is dedicated to matching the right caregivers to each client's needs."

Judy Horvath, Tender Heart's managing member, testified in her deposition that when contracting with a new client, Tender Heart "ascertain[s] the needs of the client, the brief medical history, so we know what's going on with this particular person that we're caring for, and what they would like the caregiver to do; what their needs are. . . . [W]e have to ascertain the need before we can relay those to our caregivers." The standard services provided by Tender Heart caregivers, as set forth in both the Caregiver Contract and the Client Contract, are "companionship and conversation; attendant care; respite care; personal care, grooming and hygiene; medication reminders; light housekeeping; bathing assistance; meal planning and preparation; grocery shopping and errands; transportation; escort to breakfast, lunch or dinner; answer telephone and door; help sort mail; oversee home deliveries; attend social or religious activities." (Capitalization and formatting altered.)

Both the Caregiver Contract and the Client Contract attach rate sheets setting forth standard hourly rates for shifts of different lengths. The client rate sheet states its rates

_____

[2] We use the term "client" to refer both to the person in need of caregiving services and the person responsible for paying Tender Heart (sometimes, but not always, the same person).

include both "caregiver and agency fees," and the standard hourly rates charged to clients are higher than the standard hourly pay rates for caregivers. Caregivers submit timesheets signed by the client to Tender Heart; Tender Heart then bills the client and pays caregivers from the money received from the client, keeping the difference as its fee. Horvath testified the Client Contract rate sheet was a starting point but the ultimate rate charged to a given client could vary. Plaintiff testified in her deposition that when Tender Heart told her about a caregiving opportunity, "I would get an e-mail and there would be a rate that I would be getting paid for that job. They [the rates] would vary, depending on the needs of the client." The parties dispute whether caregivers could negotiate their pay rates directly with clients; we discuss this evidence in more detail below (*post,* part II.C.1).[3]

It is undisputed that Tender Heart caregivers are free to reject any caregiving opportunity offered by Tender Heart, and Plaintiff did reject offers from time to time. Caregivers are also free to contract with other agencies for domestic work, and Plaintiff did so during her time working for Tender Heart. Tender Heart did not provide Plaintiff or other caregivers with training, tools, or supplies, and did not direct or supervise the caregiver's provision of services.

The Caregiver Contract provides: "The relationship between a CAREGIVER and client may only be terminated by either of those parties and not by [Tender Heart]. However, [Tender Heart] may decline to make additional referrals to a particular CAREGIVER . . . ." The Caregiver Contract, by its terms, remains in effect until notice of termination by either party or a caregiver's "material breach" including "[d]ischarge . . . by client for just cause," or "[a]t the direction of the client" where the caregiver

---

[3] The Caregiver Contract also provides caregivers may elect to seek "permanent placement," paying Tender Heart a fee of "20% of the fees earned by CAREGIVER during the first month of placement." The Client Contract similarly includes terms for caregiver permanent placement, whereby Tender Heart arranges interviews between the client and prospective caregivers for a one-time flat fee. There is no evidence that Plaintiff sought or received permanent placement from Tender Heart.

3

"failed to appear to perform services as scheduled." Plaintiff provided Tender Heart with notice of termination in or around March 2015.

When Plaintiff signed the Caregiver Contract in 2011, caregivers were (as they still are) excluded from the overtime provisions of the applicable Industrial Welfare Commission (IWC) wage order. (See IWC Order No. 15-2001 Regulating Wages, Hours, and Working Conditions in the Household Occupations (Wage Order 15), codified at Cal. Code Regs., tit. 8, § 11150, subds. 1(B), 2(J), 3(C) [excluding from its overtime provision "any person employed by a private householder or by any third party employer recognized in the health care industry to work in a private household, to supervise, feed, or dress a child or person who by reason of advanced age, physical disability, or mental deficiency needs supervision"].) Effective January 1, 2014, the Legislature enacted the DWBR, which provides that certain workers, including caregivers, "shall not be employed more than nine hours in any workday or more than 45 hours in any workweek unless the employee receives one and one-half times the employee's regular rate of pay for all hours worked over nine hours in any workday and for all hours worked more than 45 hours in the workweek." (§ 1454.) After the enactment of the DWBR, Tender Heart did not pay Plaintiff overtime wages.

PROCEDURAL BACKGROUND

In December 2015, Plaintiff filed a complaint against Tender Heart. The operative first amended complaint alleged Tender Heart failed to pay overtime wages in violation of the DWBR, as well as several additional claims. Tender Heart moved for summary adjudication of the DWBR claim and some of Plaintiff's additional claims.[4] As relevant here, Tender Heart sought summary adjudication on the ground that it was a non-employer employment agency pursuant to Civil Code section 1812.5095, subdivision (b), and, alternatively, on the ground that Plaintiff was an independent contractor, not an employee of Tender Heart.

_____

[4] The parties characterize these additional claims as derivative of the DWBR claim. Because no party contends a different analysis applies to the derivative claims, we do not discuss them separately.

4

The trial court denied summary adjudication on the first ground, finding Tender Heart failed to comply with all of the statutory requirements for non-employer employment agencies. However, the court granted summary adjudication on the second ground, applying the *Borello* standard for distinguishing between employees and independent contractors, and concluding the undisputed facts established Plaintiff was an independent contractor.

The court subsequently granted Tender Heart's separate motion for summary adjudication on Plaintiff's remaining claims. Judgment issued for Tender Heart, and this appeal followed.[5]

## DISCUSSION

### I. *Standard of Review*

"Summary adjudication motions are 'procedurally identical' to summary judgment motions. [Citation.] A summary judgment motion 'shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' [Citation.] To be entitled to judgment as a matter of law, the moving party must show by admissible evidence that the 'action has no merit or that there is no defense' thereto. [Citation.] A defendant moving for summary judgment meets this burden by presenting evidence demonstrating that one or more elements of the cause of action cannot be established or that there is a complete defense to the action. [Citations.] Once the defendant makes this showing, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to that cause of action or defense. [Citations.] Material facts are those that relate to the issues in the case as framed by the pleadings. [Citation.] There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in

---

[5] Plaintiff does not challenge on appeal the trial court's second summary adjudication order on her non-DWBR claims. Tender Heart argues Plaintiff's opening brief on appeal fails to comply with California Rules of Court, rule 8.204(a)(2)(C). We exercise our discretion to disregard any noncompliance. (*Id.*, rule 8.204(e)(2)(C).)

favor of the party opposing the motion in accordance with the applicable standard of proof." (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 859–860 (*Serri*).)

"The trial court's ruling on a motion for summary adjudication, like that on a motion for summary judgment, is subject to this court's independent review." (*Serri, supra,* 226 Cal.App.4th at p. 858.) "In performing our review, we view the evidence in a light favorable to the losing party . . . , liberally construing her evidentiary submission while strictly scrutinizing the moving party's own showing and resolving any evidentiary doubts or ambiguities in the losing party's favor." (*Id.* at p. 859.)[6]

## II. *Independent Contractor or Employee*

The DWBR's overtime provision applies to "domestic work employee[s]." (§ 1454.) Tender Heart contends Plaintiff was not an employee, but instead was an independent contractor to whom the overtime requirement did not apply.[7]

---

[6] Tender Heart argues Plaintiff submitted only minimal evidence in opposition to its summary adjudication motion and suggests she therefore failed to demonstrate a dispute of fact; Tender Heart further contends Plaintiff waived any argument that Tender Heart's evidence did not satisfy its initial burden on summary adjudication. The quantity of Plaintiff's opposition evidence and any failure to expressly contest Tender Heart's initial burden are of no moment. "The fact no opposition [to a summary judgment motion] has been filed does *not* relieve the judge (or the appellate court) from the duty to draw all inferences reasonably deducible from the evidence before the court." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2018) ¶ 10:303, p. 10-138.) The moving party's evidence alone may establish a triable issue of fact. (See *id.*, ¶ 10:304, p. 10-138 ["The opposing party has no burden to controvert the moving party's declarations if such declarations themselves, through inferences reasonably drawn therefrom, disclose a 'triable issue' of fact."].) Finally, although both parties cite evidence submitted in connection with Tender Heart's second summary adjudication motion on non-DWBR claims, we cannot and do not consider such evidence, which was not before the trial court at the time of the challenged order. (*California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 442 [" '[I]t has long been the general rule and understanding that "an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration." ' "].)

[7] Tender Heart contends some claims in Plaintiff's complaint were impermissibly factually inconsistent with the DWBR claims because, as to the remaining claims, Plaintiff did not incorporate the factual allegation that she was Tender Heart's employee.

6

A.  *What Standard Applies*

Plaintiff argues the trial court erred in applying the standard articulated in *Borello* to determine whether Plaintiff was an independent contractor or an employee.  Instead, Plaintiff contends, the appropriate standard is the one set forth in the DWBR itself.  Tender Heart argues the trial court properly applied the *Borello* standard.  We agree with Plaintiff that we must look to the DWBR for the applicable standard.

In *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903 (*Dynamex*), our Supreme Court recently provided "a historical review of the treatment of the employee or independent contractor distinction under California law."  (*Id.* at p. 927.)  The court began with a discussion of the common law origins of the distinction.  "[A]t common law the problem of determining whether a worker should be classified as an employee or an independent contractor initially arose in the tort context—in deciding whether the hirer of the worker should be held vicariously liable for an injury that resulted from the worker's actions.  In the vicarious liability context, the hirer's right to supervise and control the details of the worker's actions was reasonably viewed as crucial, because ' "[t]he extent to which the employer had a right to control [the details of the service] activities was . . . highly relevant to the question whether the employer ought to be legally liable for them . . . ." '  [Citation.]  For this reason, the question whether the hirer controlled the details of the worker's activities became the primary common law standard for determining whether a worker was considered to be an employee or an independent contractor."  (*Ibid.*)

---

To the extent the contention is relevant to the issue before us, we reject it.  That Plaintiff did not incorporate the allegation in some causes of action is not inconsistent with the presence of the allegation elsewhere in the complaint; in any event, whether Plaintiff was an employee is a legal conclusion, not a fact.  (See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶¶ 6:247.1, 6:248, p. 6-79 ["For the bar on inconsistent fact pleading to apply, the facts must be 'antagonistic,' " and the bar "applies to facts, not legal conclusions to be drawn from the facts (such as whether the parties had an agency relationship or instead that of buyer and seller)."].)

*Dynamex* then discussed *Borello, supra,* 48 Cal.3d 341, which considered the distinction between independent contractors and employees "for purposes of the California workers' compensation statutes." (*Dynamex, supra,* 4 Cal.5th at p. 929.) *Borello* explained "that 'the concept of "employment" embodied in the [workers' compensation act] *is not inherently limited by common law principles*' " and instead " 'must be construed *with particular reference to the "history and fundamental purposes" of the statute.*' " (*Dynamex,* at p. 930 [quoting *Borello,* at p. 351].) While *Borello* applied the common law " ' "control-of-work-details" test,' " identifying multiple relevant factors to consider, it held that test " 'must be applied with *deference to the purposes of the protective legislation.*' " (*Dynamex,* at pp. 930–932 [quoting *Borello,* at pp. 353–354].) *Dynamex* concluded that, "although we have sometimes characterized *Borello* as embodying the common law test or standard for distinguishing employees and independent contractors [citation], it appears more precise to describe *Borello* as calling for resolution of the employee or independent contractor question by focusing on the intended scope and purposes of the particular statutory provision or provisions at issue. In other words, *Borello* calls for application of a *statutory purpose* standard that considers the control of details and other potentially relevant factors identified in prior California and out-of-state cases in order to determine which classification (employee or independent contractor) best effectuates the underlying legislative intent and objective of the statutory scheme at issue." (*Dynamex*, at p. 934.)

*Dynamex* next considered *Martinez v. Combs* (2010) 49 Cal.4th 35 (*Martinez*), which "address[ed] the meaning of the terms 'employ' and 'employer' as used in California wage orders" promulgated by the IWC. (*Dynamex, supra,* 4 Cal.5th at p. 935.) The wage orders provide that " ' "[e]mploy" means to engage, suffer, or permit to work' " and " ' "[e]mployer" means any person . . . who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person.' " (*Id.* at p. 926 & fn. 9.) *Martinez* concluded the wage orders set forth " 'three alternative definitions' " for employment. (*Dynamex,* at p. 938 [quoting *Martinez,* at p. 64].) The first—"suffer[] or permit to work"—derived

8

from early child labor statutes, and "had been interpreted to impose liability upon an entity 'even when no common law employment relationship existed . . . .' " (*Dynamex,* at p. 937 [quoting *Martinez,* at p. 58].) The second—"control over the wages, hours, or working conditions"—" 'has no clearly identified, precisely literal statutory or common law antecedent,' " but by its terms encompassed joint employer scenarios and was intended to "provid[e] workers with greater protection" than federal labor laws. (*Dynamex,* at pp. 937–938 [quoting *Martinez,* at pp. 59–60].) The third alternative definition—"to engage"—" 'has no other apparent meaning in the present context than its plain, ordinary sense of "to employ," that is, to create a common law employment relationship.' " (*Dynamex,* at p. 938 [quoting *Martinez,* at p. 64].) As explained in *Dynamex,* "the court in *Martinez* . . . took pains to emphasize the importance of *not* limiting the meaning and scope of 'employment' to only the common law definition for purposes of the IWC's wage orders, declaring that 'ignoring the rest of the IWC's broad regulatory definition would substantially impair the commission's authority and the effectiveness of its wage orders. . . . Were we to define employment exclusively according to the common law in civil actions for unpaid wages we would render the commission's definitions effectively meaningless.' " (*Dynamex,* at pp. 938–939 [quoting *Martinez,* at p. 65].)

In *Dynamex* itself, the Supreme Court interpreted the "suffer or permit" language in the wage orders. (*Dynamex, supra,* 4 Cal.5th at p. 943.) After considering the history and interpretation of the language, the Supreme Court concluded "it is appropriate, and most consistent with the history and purpose of the suffer or permit to work standard in California's wage orders, to interpret that standard as: (1) placing the burden on the hiring entity to establish that the worker is an independent contractor who was not intended to be included within the wage order's coverage; and (2) requiring the hiring entity, in order to meet this burden, to establish each of the three factors embodied in the ABC test—namely (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; and (B) that the worker performs work that is

9

outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed." (*Id.* at pp. 956–957, fn. omitted.)

*Dynamex* thus "recognized that different standards could apply to different statutory claims." (*Garcia v. Border Transportation Group, LLC* (2018) 28 Cal.App.5th 558, 570.) "[S]tatutory purpose [is] the touchstone for deciding whether a particular category of workers should be considered employees rather than independent contractors for purposes of social welfare legislation." (*Dynamex, supra,* 4 Cal.5th at p. 935.) We therefore conclude that the distinction between independent contractor and employer for purposes of the DWBR must be determined by examining the language and purpose of the DWBR itself.[8]

B. *The DWBR*

The DWBR's sole substantive provision provides: "A domestic work employee who is a personal attendant shall not be employed more than nine hours in any workday or more than 45 hours in any workweek unless the employee receives one and one-half times the employee's regular rate of pay for all hours worked over nine hours in any workday and for all hours worked more than 45 hours in the workweek." (§ 1454.)[9]

---

[8] Tender Heart's reliance on *Linton v. Desoto Cab Company, Inc.* (2017) 15 Cal.App.5th 1208 (*Linton*), which applied *Borello's* test to determine whether the plaintiff was an employee or independent contractor for purposes of his Labor Code claims, is unavailing. *Linton* issued while *Dynamex* was pending, and a concurring justice noted that "as the parties have briefed and argued the matter, we are concerned only with the scope of the common law test" and not with "whether the 'additional tests for employee status' set forth in wage orders apply to wage claim cases [citation], an issue now pending before the court in *Dynamex . . . .*" (*Linton,* at p. 1226 & fn. 1 (conc. opn. of Banke, J.).) Tender Heart's reliance on *Reynolds v. Bement* (2005) 36 Cal.4th 1075 is similarly unpersuasive, in light of *Martinez's* limitation of its holding. (*Martinez, supra,* 49 Cal.4th at pp. 62–66.)

[9] The DWBR also requires the Governor to convene a committee to study the effects of the DWBR "on personal attendants and their employers." (§ 1453.) A provision in the original bill sunsetting the DWBR in 2017 was subsequently repealed. (Former § 1453 [enacted by stats. 2013, ch. 374, § 1; repealed by stats. 2016, ch. 315, § 1].)

10

" 'Personal attendant' means any person employed by a private householder or by any third-party employer recognized in the health care industry to work in a private household, to supervise, feed, or dress a child, or a person who by reason of advanced age, physical disability, or mental deficiency needs supervision. The status of personal attendant shall apply when no significant amount of work other than the foregoing is required. For purposes of this subdivision, 'no significant amount of work' means work other than the foregoing did not exceed 20 percent of the total weekly hours worked." (§ 1451, subd. (d).)[10] The DWBR's definition of personal attendant appears designed to precisely match those employees excluded from Wage Order 15's overtime provision. (See Wage Order 15, Cal. Code Regs., tit. 8, § 11150, subds. 1(B), 2(J), 3(C) [excluding "personal attendants" from overtime protections, defined as "any person employed by a private householder or by any third party employer recognized in the health care industry to work in a private household, to supervise, feed, or dress a child or person who by reason of advanced age, physical disability, or mental deficiency needs supervision. The status of personal attendant shall apply when no significant amount of work other than the foregoing is required."]; *Guerrero v. Superior Court* (2013) 213 Cal.App.4th 912, 956 [noting the Department of Labor Standards Enforcement has issued a formal opinion letter stating that "a 'significant amount' of work . . . is that exceeding 20 percent of the total hours worked"].)

The DWBR provides the following additional definitions. " 'Domestic work employee' means an individual who performs domestic work[11] and includes live-in domestic work employees and personal attendants." (§ 1451, subd. (b)(1).) The statute lists several exceptions not relevant here, including close relatives and casual babysitters.

---

[10] Tender Heart does not dispute that Plaintiff was a personal attendant within the meaning of the DWBR.

[11] " 'Domestic work' means services related to the care of persons in private households or maintenance of private households or their premises. Domestic work occupations include childcare providers, caregivers of people with disabilities, sick, convalescing, or elderly persons, house cleaners, housekeepers, maids, and other household occupations." (§ 1451, subd. (a)(1).)

11

(§ 1451, subd. (b)(2).) " 'Domestic work employer' means a person, including corporate officers or executives, who directly or indirectly, or through an agent or any other person, including through the services of a third-party employer, temporary service, or staffing agency or similar entity, employs or exercises control over the wages, hours, or working conditions of a domestic work employee." (§ 1451, subd. (c)(1).)[12] Again, the statute sets forth several exceptions, including, as we will discuss in more detail *post*, part III, employment agencies that meet certain specifications. (§ 1451, subd. (c)(2).) The DWBR does not define the term "employ" or include a definition of "independent contractor."

As an initial matter, we observe that the DWBR's definition of employer differs from that of the wage orders. In one respect—albeit one not relevant here—the DWBR is broader: it expressly includes "corporate officers or executives" in the definition of employer, while "the IWC's definition of 'employer' does not impose liability on individual corporate agents acting within the scope of their agency." (*Martinez, supra,* 49 Cal.4th at p. 66.) In another respect, the DWBR's definition of employer appears to be narrower: the DWBR does not include the "suffer or permit" definition set forth in the wage orders and analyzed in *Dynamex*.[13]

Although the DWBR's definition of employer differs from that of the wage orders in some respects, it includes one of the wage orders' alternative definitions verbatim: a person who "exercises control over the wages, hours, or working conditions" of a worker.

---

[12] While the DWBR takes care to define "domestic work employer," its overtime provision does not use the term. In *Martinez,* the Supreme Court held that section 1194, which gives "an employee a cause of action for unpaid minimum wages without specifying who is liable," only renders employers liable: "That only an employer can be liable . . . seems logically inevitable as no generally applicable rule of law imposes on anyone other than an employer a duty to pay wages." (*Martinez, supra,* 49 Cal.4th at p. 49.) We similarly conclude that only a domestic work employer can be liable for unpaid overtime wages required by the DWBR. No party suggests otherwise.

[13] An earlier version of the bill defined the term "[h]ours worked" to include "all time the domestic work employee is suffered or permitted to work . . . ." (Assem. Bill No. 241 (2013–2014 Reg. Sess.) as amended Mar. 19, 2013, § 2.)

12

While *Dynamex* expressly declined to consider this standard (*Dynamex, supra,* 4 Cal.5th at p. 943), *Martinez* observed the language "has the obvious utility of reaching situations in which multiple entities control different aspects of the employment relationship, as when one entity, which hires and pays workers, places them with other entities that supervise the work.  Consistently with this observation, the IWC has explained its decision to include the language in one modern wage order as 'specifically intended to include both temporary employment agencies and employers who contract with such agencies to obtain employees within the definition of "employer." ' " (*Martinez, supra,* 49 Cal.4th at p. 59.)

"It is a settled principle of statutory construction that the Legislature ' "is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof.  [Citation.]" [Citation.]' [Citation.]  Courts may assume, under such circumstances, that the Legislature intended to maintain a consistent body of rules and to adopt the meaning of statutory terms already construed." (*People v. Scott* (2014) 58 Cal.4th 1415, 1424.)  We see no reason why a different principle would apply to judicial construction of wage orders.  (See *Dynamex, supra,* 4 Cal.5th at p. 914, fn. 3 ["In California, wage orders are constitutionally-authorized, quasi-legislative regulations that have the force of law."].)  Accordingly, we presume the Legislature, in using the term "control of the wages, hours, or working conditions" in enacting the DWBR in 2013, intended to incorporate the meaning of that term as set forth in the Supreme Court's 2010 *Martinez* decision.[14]

---

[14] In *Dynamex,* the Supreme Court declined to determine whether the control over wages, hours, or working conditions definition applies "only in circumstances in which the question at issue is whether, when workers are 'admitted employees' of one business (the primary employer), a business entity that has a relationship to the primary employer should also be considered an employer of the workers such that it is jointly responsible for the obligations imposed by the wage order." (*Dynamex, supra,* 4 Cal.5th at p. 943.) We follow the "number of post-*Martinez* Court of Appeal decisions recognizing that the definitions of 'employ' and 'employer' discussed in *Martinez* now govern the resolution of claims arising out of California wage orders, including whether a worker is an employee or independent contractor." (*Dynamex,* at p. 947.)

The Legislature's use of this definition indicates it wanted to ensure that all joint employers of domestic workers are liable, including " 'temporary employment agencies' " (*Martinez, supra,* 49 Cal.4th at p. 59). Other indicia of this intent are also present. Notably, in providing certain employment agencies were not domestic work employers for purposes of the DWBR, the Legislature provided that only those employment agencies meeting "*all* of the factors" in a lengthy and detailed list of requirements are not employers. (§ 1451, subd. (c)(2)(B), italics added; see part III, *post.*) The narrowness and specificity of this exception indicates the Legislature intended those employment agencies that do not meet all of the requirements may well be considered employers for purposes of the DWBR. As a Court of Appeal considering a statute providing that the same requirements render a domestic work employment agency not an employer for purposes of workers' compensation law reasoned, "Domestic workers that would potentially fall within the confines of [the statutory exception] are free to assert that they are employees of an employment agency for workers' compensation purposes because it has not complied with the requirements of that section and therefore is considered an employer." (*An Independent Home Support Service, Inc. v. Superior Court* (2006) 145 Cal.App.4th 1418, 1431 (*An Independent Home*).) In addition, legislative analyses noted proponents' arguments that "[e]ven domestic workers employed by agencies labor in individual homes and deserve equal rights and labor protections." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 241 (2013–2014 Reg. Sess.) as amended Sept. 3, 2013, p. 9.)

In addition to the control over wages, hours, or working conditions definition, the DWBR also defines a domestic work employer as one who "employs" a domestic work employee. (§ 1451, subd. (c)(1) [domestic work employer "employs *or* exercises control over the wages, hours, or working conditions of a domestic work employee" (italics added)].) *Martinez* held " 'to employ' "—absent an express definition, such as the one set forth in the wage orders—means "to create a common law employment relationship." (*Martinez, supra,* 49 Cal.4th at p. 64.) The DWBR thus also incorporates the common law definition of employment.

We turn now to the purpose of the statute. In *Dynamex,* the Supreme Court discussed the general worker-protective purpose behind wage and hour legislation, such as the DWBR. "Wage and hour statutes and wage orders were adopted in recognition of the fact that individual workers generally possess less bargaining power than a hiring business and that workers' fundamental need to earn income for their families' survival may lead them to accept work for substandard wages or working conditions. The basic objective of wage and hour legislation and wage orders is to ensure that such workers are provided at least the minimal wages and working conditions that are necessary to enable them to obtain a subsistence standard of living and to protect the workers' health and welfare." (*Dynamex, supra,* 4 Cal.5th at p. 952.) *Dynamex* noted such statutes are "primarily for the benefit of the workers themselves," but also benefitted "law-abiding businesses that comply with the obligations imposed by the wage orders, ensuring that such responsible companies are not hurt by unfair competition from competitor businesses that utilize substandard employment practices," as well as "the public at large, because if the wage orders' obligations are not fulfilled the public will often be left to assume responsibility for the ill effects to workers and their families resulting from substandard wages or unhealthy and unsafe working conditions." (*Id.* at pp. 952–953.)

These purposes are echoed in the legislative history of the DWBR. Legislative analyses acknowledged that "domestic workers are largely excluded from some of the more basic protections afforded to other workers under state and federal law, including the rights to overtime wages, meal and rest period rights and safe and healthy working conditions." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 241 (2013–2014 Reg. Sess.) as amended Sept. 6, 2013, p. 2; see also Assem. Floor Analysis, Conc. in Sen. Amends. to Assem. Bill No. 241 (2013–2014 Reg Sess.) as amended Sept. 6, 2013, p. 2 (hereafter, Assem. Floor Analysis).) A committee report quoted studies stating that " 'household workers frequently find themselves working in substandard and often exploitative conditions, earning poverty wages too low to support their own families, and lacking access to basic health care.' " (Assem. Labor & Employment Com., Analysis of Assem. Bill. No. 241 (2013–2014 Reg. Sess.) as

15

amended Mar. 19, 2013, p. D; see also Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 241 (2013–2014 Reg. Sess.) as amended Sept. 3, 2013, p. 9 ["The author's office notes that domestic workers are among the most isolated and vulnerable workforce in the state."].)  The bill's sponsor explained: " 'The campaign to adopt a California Domestic Worker Bill of Rights attempts to address one core principle: domestic workers deserve equal treatment under the law.  Unfortunately, California suffers from a unique and confounding contradiction: Domestic workers who care for property such as landscaping or housekeeping are generally entitled to overtime.  Those domestic workers who care for children, the infirm, the elderly, and those with disabilities do not.  The California Domestic Worker Bill of Rights attempts to correct this injustice.' " (Assem. Floor Analysis, p. 2.)[15]

*Dynamex* noted the "general principle that wage orders are the type of remedial legislation that must be liberally construed in a manner that serves its remedial purposes," and further found the worker-protective purposes of the wage orders "support a very broad definition of the workers who fall within the reach of the wage orders." (*Dynamex, supra,* 4 Cal.5th at pp. 952–953.)  Because similar objectives underlie the DWBR, we conclude the DWBR's provisions governing which domestic workers are covered by its overtime requirement must be liberally construed.  We bear in mind the Supreme Court's recent observation: "Although in some circumstances classification as an independent contractor may be advantageous to workers as well as to businesses, the risk that workers who should be treated as employees may be improperly misclassified as independent contractors is significant in light of the potentially substantial economic incentives that a business may have in mischaracterizing some workers as independent contractors.  Such incentives include the unfair competitive advantage the business may obtain over

---

[15] Earlier versions of the bill included additional protections for domestic workers, such as meal and rest breaks and paid vacation days.  (See Assem. Bill No. 241 (2013–2014 Reg. Sess.) as amended Mar. 19, 2013.)  These additional protections were removed in later amendments, leaving the overtime requirement as the only substantive protection in the final bill.  (See Assem. Floor Analysis, p. 1.)

16

competitors that properly classify similar workers as employees and that thereby assume the fiscal and other responsibilities and burdens that an employer owes to its employees." (*Dynamex,* at p. 913.)

Finally, the DWBR does not identify which party bears the burden of proof in determining whether the worker is an employee or an independent contractor. The workers' compensation law provides "that '[a hiring business] seeking to avoid liability has the burden of proving that persons whose services [the business] has retained are independent contractors rather than employees.' [Citation.] Moreover, the rule that a hiring entity has the burden of establishing that a worker is an independent contractor rather than an employee has long been applied in California decisions outside the workers' compensation context." (*Dynamex, supra,* 4 Cal.5th at p. 958, fn. 24; see also *Linton, supra,* 15 Cal.App.5th at p. 1221 ["the rebuttable presumption of employment in [the workers' compensation laws] applies to actions brought under Labor Code provisions falling outside workers' compensation"].) In light of the liberal construction we afford the DWBR, we conclude the burden should fall with the hiring entity to prove that a domestic worker is an independent contractor not entitled to the overtime protection of the DWBR.

In sum, the DWBR contains two alternative definitions of employment for purposes of its provisions: (1) when the hiring entity exercises control over the wages, hours, or working conditions of a domestic worker; or (2) when a common law employment relationship has been formed. Both definitions must be construed broadly in light of the purposes of the DWBR, and the hiring entity bears the burden of establishing that a domestic worker is an independent contractor rather than an employee.

C. *Application to This Case*

We now apply these tests to the case at hand, construing, as we must, "the evidence in a light favorable to the losing party . . . , liberally construing her evidentiary submission while strictly scrutinizing the moving party's own showing and resolving any evidentiary doubts or ambiguities in the losing party's favor." (*Serri, supra,* 226 Cal.App.4th at p. 859.)

17

### 1. *Control Over Wages, Hours, or Working Conditions*[16]

" '[C]ontrol over wages' means that a person or entity has the power or authority to negotiate and set an employee's rate of pay . . . ." (*Futrell v. Payday California, Inc.* (2010) 190 Cal.App.4th 1419, 1432 (*Futrell*).) Thus, in *Martinez,* the Supreme Court rejected the argument that an entity contracting with the plaintiffs' employer exercised control over the plaintiffs' wages (and was thus a joint employer), in part because the plaintiffs' employer "alone . . . determined their rate and manner of pay (hourly or piece rate) . . . ." (*Martinez, supra,* 49 Cal.4th at p. 72.) In *Futrell,* the Court of Appeal found a payroll processing company, simply by "handling the ministerial tasks of calculating pay and tax withholding, and by also issuing paychecks, drawn on its own bank account," did not exercise control over a worker's wages. (*Futrell,* at p. 1432.)

The Client Contract[17] attaches a rate sheet listing the "total combined negotiated caregiver and agency fees based on standard services for one client."[18] Horvath testified

---

[16] Tender Heart contends that, at the hearing below, Plaintiff only argued Tender Heart exercised control by retaining the ability to refuse further referrals, and that Plaintiff has therefore waived any other "theories of 'control.' " In Plaintiff's opposition brief below, she contended Tender Heart controlled her wages and hours; she also argued she was an employee under *Borello's* multi-factor test. Plaintiff's arguments on appeal are preserved.

[17] Tender Heart notes that the Client Contract is "subject to preserved evidentiary objections" and provides a record citation to the objection it filed in the trial court. The trial court did not rule on the objection and it is thus presumptively overruled and "can still be raised on appeal," however, "the burden [is] on the objector to renew the objections in the appellate court." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534.) Tender Heart's record citation to its objection below, without advancing any argument on the evidentiary issue in its appellate brief, is not sufficient to raise the issue on appeal. (*Serri, supra,* 226 Cal.App.4th at p. 854 ["It is inappropriate for an appellate brief to incorporate by reference arguments contained in a document filed in the trial court. [Citation.] Such practice does not comply with the requirement that an appellate brief 'support each point by argument and, if possible, by citation of authority.' "].) We note that Horvath testified the Client Contract in evidence was the standard contract Tender Heart had been using for at least several years.

the Client Contract rate sheet was a starting point but the ultimate rate charged to a given client "does fluctuate, depending upon the needs and depending upon how complicated those needs are, and the clients often . . . . want to negotiate a lower rate." The Caregiver Contract similarly attaches Tender Heart's "fee schedule" listing caregiver pay rates.[19] As with the client rate sheet, the caregiver pay rates may vary: the caregiver pay rate sheet includes the express disclaimer that "rates are subject to variation due to client need and financial limitations."

Caregivers are paid a portion of the amount Tender Heart bills to clients. The caregiver's portion does not appear to be a set percentage of the client rate, or any other fixed formula in connection to the client's rate. For example, the standard rates provide that a client pay $19.75 per hour for a shift of four or more hours. However, the standard caregiver rates provide that a caregiver will receive $13 per hour for a shift of four to seven hours, $12 per hour for a shift of eight to ten hours, and $11 per hour for a shift of ten or more hours. There is no evidence in the record as to how the caregiver's pay rate is set when the client rate is higher or lower than the standard rate. Plaintiff testified in her deposition that when Tender Heart told her about a caregiving opportunity, "I would get an e-mail and there would be a rate that I would be getting paid for that job."

The Caregiver Contract provides the "[c]aregiver is free to negotiate with the client the amount proposed to be paid for services." However, immediately following this sentence, the Caregiver Contract states: "Fees for temporary employment *shall be paid in accordance with the fee schedule* unless" the caregiver has agreed to have certain initial costs (for a background check and liability insurance) paid through payroll deductions. (Italics added.) The Client Contract provides: "In the event the required

---

[18] The client rate sheet lists the hourly rates for two hours as $27 per hour, three hours as $24 per hour, and four or more hours as $19.75 per hour. The rate sheet also provides flat rates for night shifts and 24-hour shifts.

[19] The caregiver pay rate sheet lists the hourly pay rate for two to three hours is $15 per hour, for four to seven hours is $13 per hour, for eight to ten hours is $12 per hour, and for more than ten hours is $11 per hour. The caregiver pay rate sheet also includes flat rates for night shifts and 24-hour shifts.

19

services are more involved than initially assessed or represented, or service is to be provided to more than one individual, the caregiver reserves the right to adjust the rates accordingly. An additional client on the premises normally is assessed a surcharge of 1.5 times the prevailing base rate."

Horvath testified that caregivers may "want to negotiate a higher rate" and "we negotiate for the caregivers . . . ." In her deposition, Plaintiff testified she sometimes asked Tender Heart for a higher pay rate. She did not feel free to talk to clients directly about her pay rate, although she had not specifically been directed not to do so. Plaintiff testified about rate negotiations with a particular client, as follows:

"Q. And during the course of providing caregiver services for that person, you wanted a change in your rate?

"A. Yes.

"Q. And do you recall talking to the daughter about that?

"A. No. I talked to the agency first.

"Q. And then at some point, you talked to the daughter directly?

"A. She came to me and I let her know, you know, I'm caring for both of your parents now, so, you know, doing their total care, so it makes sense.

"Q. You had no problem talking to them directly about the rate?

"A. No, I didn't talk to her about any rate. I just let her know that I believe I deserved a raise, because I'm taking care of both of her parents, and this was after I talked to the agency first.

"Q. And did the daughter agree to that?

"[Plaintiff's counsel]: Agree to what?

"[Tender Heart's counsel]: The change in rate.

"[Plaintiff]: She spoke to the agency and they discussed, to where it should go, and then the agency reached out to me, to ask me where [I] think it should go. And I told them initially, I don't know, I wasn't -- I don't know.

"[Tender Heart's counsel]: At some point did you discuss what you wanted as a rate with someone?

20

"A. Yes.

"Q. And was that honored?

"A. They would get back to me on what they could get from the client.

"Q. Okay. And then, after that, was your request honored?

"A. It met in the middle somehow.

"Q. Was that agreeable with you?

"A. It was what I was able to get paid."

Construing the above evidence in the light most favorable to Plaintiff, a factfinder could find as follows. Tender Heart negotiates with the client about the initial rates the client will pay, and then unilaterally determines what portion of that rate the caregiver will receive. Caregivers can seek higher pay for a given client only, as set forth in the Client Contract, when "the required services are more involved than initially assessed or represented." Moreover, caregivers cannot negotiate their pay directly with the client, but must request that Tender Heart do so. If Tender Heart does renegotiate the rate with the client, it then determines, again unilaterally, what portion of the increased rate will go to the caregiver. We conclude Plaintiff demonstrated a dispute of fact over whether Tender Heart exercised "the power or authority to negotiate and set [Plaintiff's] rate of pay," and thereby exercised control over her wages. (*Futrell, supra,* 190 Cal.App.4th at p. 1432.)

Plaintiff also contends Tender Heart exercised control over her hours, citing evidence that Tender Heart would inform Plaintiff of the hours of an offered shift. The evidence is undisputed that Plaintiff could refuse any offered shift. We therefore conclude the undisputed facts demonstrate Tender Heart did not control Plaintiff's hours. Plaintiff does not contend Tender Heart exercised control over her working conditions. However, as *Martinez* observed, this definition of employment is "phrased . . . in the alternative (i.e., 'wages, hours, *or* working conditions)," and thus control over any one of the three creates an employment relationship. (*Martinez, supra,* 49 Cal.4th at p. 59.) Plaintiff has thus established a dispute of fact as to whether Tender Heart was her employer because it exercised control over her wages.

21

## 2. *Common Law*

We also consider whether there is a fact dispute as to whether Plaintiff was an employee under the common law, construing the factors identified in *Borello* in light of the worker-protective purposes of the DWBR. These factors include those employed in prior California cases: "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; . . . (h) whether or not the parties believe they are creating the relationship of employer-employee"; and (i) " 'the right to discharge at will, without cause.' " (*Borello, supra,* 48 Cal.3d at pp. 350–351.) They also include a six-factor test developed by other jurisdictions: "(1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; . . . (5) whether the service rendered is an integral part of the alleged employer's business"; and (6) "the 'right to control the work.' " (*Id.* at pp. 354–355.)

The facts of *Borello* itself are instructive. The workers in *Borello* were "agricultural laborers engaged to harvest cucumbers under a written 'sharefarmer' agreement" with Borello, a grower of multiple crops, including cucumbers. (*Borello, supra,* 48 Cal.3d at pp. 345, 347.) The workers "arrive around '2–3 weeks' before the harvest begins," "contract for the amount of land they wish to harvest," and "are 'totally responsible' for the care of the plants in their assigned plots during the harvest period." (*Id.* at p. 347.) They set their own hours and Borello does not supervise or direct them. (*Ibid.*) They are paid based on a share of the gross proceeds. (*Id.* at p. 346.) After

22

considering multiple factors, the Supreme Court found the workers were employees, not independent contractors, for purposes of the workers' compensation laws. (*Id.* at p. 360.)

The Supreme Court first considered that "Borello, whose business is the production and sale of agricultural crops, exercises 'pervasive control over the operation as a whole.' [Citation.] Borello owns and cultivates the land for its own account. Without any participation by the sharefarmers, Borello decides to grow cucumbers, obtains a sale price formula from the only available buyer, plants the crop, and cultivates it throughout most of its growing cycle. The harvest takes place on Borello's premises, at a time determined by the crop's maturity. During the harvest itself, Borello supplies the sorting bins and boxes, removes the harvest from the field, transports it to market, sells it, maintains documentation on the workers' proceeds, and hands out their checks. Thus, '[a]ll meaningful aspects of this business relationship: price, crop cultivation, fertilization and insect prevention, payment, [and] right to deal with buyers . . . are controlled by [Borello].' " (*Borello, supra,* 48 Cal.3d at p. 356, fn. omitted.) The Supreme Court additionally found the workers "form a regular and integrated portion of Borello's business operation. Their work, though seasonal by nature, is 'permanent' in the agricultural process. . . . This permanent integration of the workers into the heart of Borello's business is a strong indicator that Borello functions as an employer under the [Workers' Compensation] Act." (*Id.* at p. 357.)

While a caregiving business has fewer operational details to control than that of a cucumber grower, there is evidence that Tender Heart selects clients, performs the initial assessment of the clients' needs, matches caregivers according to the clients' needs, negotiates the amount charged to the client, and determines what portion of that amount will be paid to the caregiver. These facts, if established, constitute substantial control over the details of the caregiving business. Tender Heart protests that it is not in the business of caregiving, but is simply a referral agency. There is evidence that its business is to enter into contracts with clients for the provision of caregivers matched to that client's needs, as determined by Tender Heart's assessment. Absent the caregivers, Tender Heart could not fulfill its contracts with clients and therefore could not operate its

23

business.  As in *Borello,* there is evidence the caregivers "form a regular and integrated portion of [Tender Heart's] business operation." (*Borello, supra,* 48 Cal.3d at p. 357, see also *Linton, supra,* 15 Cal.App.5th at p. 1223 ["The work [the plaintiff cab driver] performed is part and parcel of what defendant does, which is operate cabs in San Francisco.  A strong argument can be made that without plaintiff and others like him, the service defendant provides could not be accomplished."].)

The grower in *Borello* did not supervise the work of the harvesters, but the Supreme Court did not find this fact significant because "the cucumber harvest involves simple manual labor which can be performed in only one correct way.  Harvest and plant-care methods can be learned quickly.  While the work requires stamina and patience, it involves no peculiar skill beyond that expected of any employee.  [Citations.]  It is the simplicity of the work, not the harvesters' superior expertise, which makes detailed supervision and discipline unnecessary.  Diligence and quality control are achieved by the payment system, essentially a variation of the piecework formula familiar to agricultural employment." (*Borello, supra,* 48 Cal.3d at pp. 356–357.)  It is undisputed that Tender Heart did not supervise Plaintiff in the performance of her caregiving duties.  Horvath's declaration avers that caregiving "require[s] skills and experience which go well beyond those possessed by the average person."  However, there is also evidence that the duties of a caregiver—while demanding and necessitating patience, empathy, and good humor—do not require special skills or training.  Most notably, the list of caregiving duties set forth in Tender Heart's contracts are basic activities of daily living: companionship, personal care and hygiene, medication reminders, meal preparation, errands, answering the phone or door, attending events.[20]  Construing the evidence in the light most favorable to Plaintiff, a factfinder could conclude a caregiver's duties, like that

---

[20] Although Tender Heart asserts that additional services were required depending on the client's need, it cites no evidence identifying such additional services or establishing that they required special skill or training.  Tender Heart also points to evidence that Plaintiff was a certified nursing assistant and was enrolled in college courses during her time performing caregiver work with Tender Heart.  There is no evidence that a caregiver had to be a certified nursing assistant or take college courses to perform caregiving duties.

of a cucumber harvester, are simply not the type requiring detailed supervision. (See *Linton, supra,* 15 Cal.App.5th at p. 1222 ["That a degree of freedom is permitted to a worker, or is inherent in the nature of the work involved, does not automatically lead to the conclusion that a worker is an independent contractor."].)

The parties dispute whether Tender Heart retained the right to terminate caregivers at will. (See *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 531 ["Perhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.' "].) The Caregiver Contract provides: "The relationship between a CAREGIVER and client may only be terminated by either of those parties and not by [Tender Heart]. However, [Tender Heart] may decline to make additional referrals to a particular CAREGIVER . . . ." The impact of the restriction on Tender Heart's ability to terminate a relationship between a caregiver and client depends on an ambiguous term, "relationship." Does the relationship between a caregiver and a client form after one shift, or does it require repeated shifts? Does the relationship, once formed, last for the duration of Tender Heart's contract with that client, or for some shorter period? But for this ambiguous restriction, Tender Heart's ability to decline to make additional referrals, apparently without cause, seems akin to the ability to terminate at will.[21] Tender Heart argues it never unilaterally ceased making referrals to Plaintiff, but "what matters is whether a hirer has the 'legal right to control the activities of the alleged agent' . . . . That a hirer chooses not to wield power does not prove it lacks power." (*Ayala,* at p. 535.)

---

[21] Tender Heart notes that a statute declaring certain domestic work employment agencies are not employers provides "an employment agency may decline to make additional referrals to a particular domestic worker . . . ." (Civ. Code, § 1812.5095, subd. (b)(9); see *post,* part III.) However, the statute sets forth numerous detailed requirements for an employment agency to fall within its provisions. We decline to construe the Legislature's inclusion of this provision to mean that an agency's right to decline to make additional referrals is never indicative of an employment relationship.

*Borello* also found the harvesters "engage in no distinct trade or calling. They do not hold themselves out in business. They perform typical farm labor for hire wherever jobs are available. They invest nothing but personal service and hand tools. They incur no opportunity for 'profit' or 'loss;' like employees hired on a piecework basis, they are simply paid by the size and grade of cucumbers they pick. They rely solely on work in the fields for their subsistence and livelihood." (*Borello, supra,* 48 Cal.3d at pp. 357–358, fns. omitted.) There is no evidence that Plaintiff held herself out in business. The list of caregiving duties does not suggest a need for specialized tools or supplies, although Plaintiff testified she purchased her own scrubs. She testified in her deposition that she signed up with multiple caregiving agencies at the same time she received referrals from Tender Heart. Horvath averred it was "not uncommon for caregivers to work with multiple agencies, at the same time, in order to secure sufficient work to fill their available hours . . . ." Like the cucumber harvesters, there is evidence that Plaintiff did not have an opportunity for profit or loss, but simply performed caregiving for hire wherever she could find work.

The Supreme Court discounted the harvesters' contractual agreement that they are not employees: "where compelling indicia of employment are otherwise present, we may not lightly assume an individual waiver of the protections derived from that status. [¶] Moreover, there is no indication that Borello offers its cucumber harvesters any real choice of terms." (*Borello, supra,* 48 Cal.3d at pp. 358–359.) Similarly, although the Caregiver Contract signed by Plaintiff stated she was an independent contractor, not an employee, there is evidence of other indicia of employment and Plaintiff averred in her declaration that the Caregiver Contract was presented to her "on a take it or leave it basis." [22] "A party's use of a label to describe a relationship with a worker . . . will be ignored where the evidence of the parties' actual conduct establishes that a different relationship exists." (*Futrell, supra,* 190 Cal.App.4th at p. 1437; see also *Linton, supra,*

---

[22] Although Tender Heart argues the trial court found Plaintiff's declaration "largely inadmissible," the court found this fact admissible.

15 Cal.App.5th at p. 1222 ["the mere fact the employment agreement characterizes the relationship of the parties in a particular way is not determinative of the actual legal status of the parties"].)

The Supreme Court in *Borello* concluded the harvesters "have no practical opportunity to insure themselves or their families against loss of income caused by nontortious work injuries. If Borello is not their employer, they themselves, and society at large, thus assume the entire financial burden when such injuries occur. Without doubt, they are a class of workers to whom the protection of the [Workers' Compensation] Act is intended to extend." (*Borello, supra,* 48 Cal.3d at pp. 357–358, fns. omitted.) Similarly, Plaintiff entered into a contract written by Tender Heart to fulfill caregiving contracts between Tender Heart and its clients, and there is evidence Plaintiff was paid wages determined by Tender Heart. Moreover, at least under the standard terms of the rate sheet incorporated as part of the Caregiver Contract, her hourly wage *decreased* for shifts that, under the DWBR, would entitle her to overtime wages: she received $13 per hour for a shift of four to seven hours, $12 per hour for a shift of eight to ten hours, and $11 per hour for a shift of more than ten hours. There is evidence that Plaintiff is the type of worker the DWBR was enacted to protect.

In sum, Plaintiff established a dispute of fact as to whether she was an independent contractor or employee under both the "control over wages" test and the common law test. The trial court erred in granting summary adjudication to Tender Heart on this ground.[23]

III. *Employment Agency Exception*

Tender Heart argues we can affirm the trial court on an alternative ground, to wit, that the undisputed facts establish it is a non-employer employment agency.

As noted above, the DWBR includes certain exceptions to its definition of domestic work employer. One of these exceptions is "[a]n employment agency that

---

[23] This conclusion renders it unnecessary for us to decide whether, as Plaintiff argues, the trial court also erred in denying her motion for a new trial on the employee/independent contractor issue.

complies with Section 1812.5095 of the Civil Code and that operates solely to procure, offer, refer, provide, or attempt to provide work to domestic workers if the relationship between the employment agency and the domestic workers for whom the agency procures, offers, refers, provides, or attempts to provide domestic work is characterized by all of the factors listed in subdivision (b) of Section 1812.5095 of the Civil Code and Section 687.2 of the Unemployment Insurance Code." (§ 1451, subd. (c)(2)(B).) Civil Code section 1812.5095, in turn, provides that "[a]n employment agency is not the employer of a domestic worker for whom it procures, offers, refers, provides, or attempts to provide work, if all of the following factors characterize the nature of the relationship," including that "a signed contract or agreement between the employment agency and the domestic worker" specifies "[h]ow the employment agency's referral fee shall be paid." (Civ. Code, § 1812.5095, subd. (b).)[24]

---

[24] The entire list of required factors is: "(1) There is a signed contract or agreement between the employment agency and the domestic worker that contains, at a minimum, provisions that specify all of the following: [¶] (A) That the employment agency shall assist the domestic worker in securing work. [¶] (B) How the employment agency's referral fee shall be paid. [¶] (C) That the domestic worker is free to sign an agreement with other employment agencies and to perform domestic work for persons not referred by the employment agency. [¶] (2) The domestic worker informs the employment agency of any restrictions on hours, location, conditions, or type of work he or she will accept and the domestic worker is free to select or reject any work opportunity procured, offered, referred, or provided by the employment agency. [¶] (3) The domestic worker is free to renegotiate with the person hiring him or her the amount proposed to be paid for the work. [¶] (4) The domestic worker does not receive any training from the employment agency with respect to the performance of domestic work. However, an employment agency may provide a voluntary orientation session in which the relationship between the employment agency and the domestic worker, including the employment agency's administrative and operating procedures, and the provisions of the contract or agreement between the employment agency and the domestic worker are explained. [¶] (5) The domestic worker performs domestic work without any direction, control, or supervision exercised by the employment agency with respect to the manner and means of performing the domestic work. An employment agency shall not be deemed to be exercising direction, control, or supervision when it takes any of the following actions: [¶] (A) Informs the domestic worker about the services to be provided and the conditions of work specified by the person seeking to hire a domestic worker. [¶] (B) Contacts the person who has hired the domestic worker to determine whether that

28

The trial court found Tender Heart's contract with Plaintiff did not specify "[h]ow the employment agency's referral fee shall be paid" as required by Civil Code section 1812.5095, subdivision (b)(1)(B). Tender Heart points to paragraph 4 of the Caregiver Contract, which provides: "<u>PAYMENT OF FEES</u>. Caregiver shall remit to [Tender Heart] each Monday a timesheet showing hours worked and signed by Client. [Tender Heart's] billing service shall bill Client for services rendered by CAREGIVER. When [Tender Heart's] billing service receives payment from the Client the payment will be placed into a trust account and the CAREGIVER will be paid the amount due. [Tender Heart] is not obligated to pay the CAREGIVER if the person for whom the services were performed fails or refuses to pay for the services. If engagement is terminated, [Tender Heart's] fee may not exceed CAREGIVER's gross earnings in that engagement." Tender

person is satisfied with the agency's referral service. [¶] (C) Informs the domestic worker of the time during which new referrals are available. [¶] (D) Requests the domestic worker to inform the employment agency if the domestic worker is unable to perform the work accepted. [¶] (6) The employment agency does not provide tools, supplies, or equipment necessary to perform the domestic work. [¶] (7) The domestic worker is not obligated to pay the employment agency's referral fee, and the employment agency is not obligated to pay the domestic worker if the person for whom the services were performed fails or refuses to pay for the domestic work. [¶] (8) Payments for domestic services are made directly to either the domestic worker or to the employment agency. Payments made directly to the employment agency shall be deposited into a trust account until payment can be made to the domestic worker. [¶] (9) The relationship between a domestic worker and the person for whom the domestic worker performs services may only be terminated by either of those parties and not by the employment agency that referred the domestic worker. However, an employment agency may decline to make additional referrals to a particular domestic worker, and the domestic worker may decline to accept a particular referral." (Civ. Code, § 1812.5095, subd. (b); see also Unempl. Ins. Code, § 687.2.) The legislative history of Civil Code section 1812.5095 indicates it "was intended to be 'declaratory of existing law decided in *Avchen v. Kid[d]oo* (1988) 200 Cal.App.3d 532.' " (*An Independent Home, supra,* 145 Cal.App.4th at p. 1434.) In *Avchen v. Kiddoo,* the Court of Appeal found a nurses' registry was not an employer for unemployment purposes where the registry signed up nurses, informed them of work opportunities, and put them in touch with the hospital or patient seeking a nurse, at which point the nurse and the hospital or patient would establish the rate of pay, and the registry would collect a commission from the nurse for successful placements. (*Avchen v. Kiddoo,* at p. 534.)

Heart also points to an additional contract between Plaintiff and an entity called "JAH Tender Heart," which provides in relevant part that Plaintiff "authorize[s] JAH Tender Heart to invoice, collect, deposit and distribute my fees for services rendered as a private caregiver. [¶] I will supply JAH Tender Heart my client information and the appropriate fees due on a weekly basis, JAH agrees to invoice these clients on a weekly basis, accept payments from the client as a fiduciary and distribute my proceeds every other Monday."

Tender Heart argues these provisions satisfy the employment agency exception by specifying that Tender Heart's fee is paid by "leaving [Tender Heart] with the difference after distributing the caregiver's agreed fixed share." We disagree. As an initial matter, there is no evidence that "JAH Tender Heart" is the same entity as Tender Heart, and therefore no basis to conclude that the terms of the contract between Plaintiff and JAH Tender Heart can be considered to determine whether the "contract or agreement between the employment agency and the domestic worker" contains the necessary provisions. Even so assuming, the identified provisions leave it entirely unclear how Tender Heart's fee is paid.[25] The only provision relevant to Tender Heart's fee addresses the maximum fee payable to Tender Heart if a caregiver's engagement is terminated. We agree with Tender Heart that the statute does not require the amount or rate of the fee be specified in the contract. Nonetheless, the requirement that the contract specify "how" the fee is paid requires *some* specification, and none is provided in the provisions here.

We also note that for an employment agency to fall within the DWBR's safe harbor, the statute additionally requires "[t]he domestic worker is free to renegotiate with the person hiring him or her the amount proposed to be paid for the work." (Civ. Code,

_____

[25] A review of the standard rate sheets attached to the Client Contract and the Caregiver Contract indicate that Tender Heart's fee is a portion of the rate paid by the client. However, for the employment agency exception to apply, the referral fee specification must appear in "a signed contract or agreement *between the employment agency and the domestic worker*." (Civ. Code, § 1812.5095, subd. (b), italics added.)

§ 1812.5095, subd. (b)(3).) As we have concluded above, Plaintiff established a fact dispute on this issue.[26]

Accordingly, we cannot affirm the trial court's order on the alternative ground that the undisputed facts establish Tender Heart is a non-employer employment agency pursuant to section 1451, subdivision (c)(2)(B).

## DISPOSITION

The order granting summary adjudication for Tender Heart on Plaintiff's first seven causes of action is reversed, and the matter is remanded for proceedings not inconsistent with this opinion. Plaintiff shall recover her costs on appeal.

---

[26] In the trial court, Plaintiff argued this additional reason why Tender Heart did not comply with the employment agency exception.

_____

SIMONS, Acting P.J.

We concur.

_____

NEEDHAM, J.

_____

BRUINIERS, J.*

(A152535)

_____
* Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

32

Superior Court of Contra Costa County, No. MSC15-02271, Hon. Judith Craddick, Judge.

Aiman-Smith & Marcy, Joseph Clapp for Plaintiff and Appellant.

Fritz Law Offices, William F. Fritz and Theresa R Fritz for Defendant and Respondent.