Filed 10/25/24  Gordon v. 101 Ash CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOHN A. GORDON,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>101 ASH, LLC et al.,<br><br>    Defendants and Respondents. | D081523<br>(Consolidated with D081919)<br><br><br>(Super. Ct. No. 37-2020-00028837-CU-FR-CTL) |

APPEAL from judgments of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

Aguirre & Severson, Michael J. Aguirre, Maria C. Severson, and Elijah T. Gaglio for Plaintiff and Appellant.

Vantage Law Group and Michael H. Riney; Caldarelli Hejmanowski Page & Leer and Marisa Janine-Page for Defendant and Respondent 101 Ash, LLC.

Office of the City Attorney, Mara W. Elliot, City Attorney, and M. Travis Phelps, Assistant City Attorney; Schwartz Semerdjian Cauley & Evans, Dick A. Semerdjian and John A. Schena for Defendants and Respondents City of San Diego and Rolando Charvel.

Ballard Spahr, Craig Soloman Ganz, Michael S. Myers, and Mitchell L. Turbenson for Defendant and Respondent Wilmington Trust, National Association.

In 2016, defendant City of San Diego (the City)[1] entered into a lease-to-own agreement (Lease) for an office building located at 101 Ash Street in downtown San Diego (Ash Street Property or Building).  Not long after the City workers had moved into the Building, asbestos contamination required all workers to vacate the Ash Street Property.  The City sued the various principals involved in the Lease transaction.  Plaintiff John A. Gordon, a taxpayer, brought his own suit against the City and other principals to the Lease (which is the matter pending before us), alleging that the Lease violated the California Constitution and is thus void, and seeking disgorgement of payments the City had made under the Lease.  After Gordon's suit had commenced, the City settled its lawsuit with the various principals (Settlement Agreement).  One of the terms of the Settlement Agreement was the termination of the Lease.

On appeal, we independently conclude that the claims in Gordon's operative complaint are moot because the Lease ceased to exist under the Settlement Agreement.  We further conclude that the exceptions to the mootness doctrine are inapplicable; and that, without any remaining injury or wrong in his operative complaint, Gordon is not entitled to disgorgement of the rent the City paid under the Lease.  We thus affirm the judgments for Defendants.

---

[1]     Also named in this lawsuit is defendant Rolando Charvel, sued in his official capacity as the City's chief financial officer (collectively, the City).

2

FACTUAL AND PROCEDURAL OVERVIEW

A. *Prelude to the Lease*

In 2014, during a review of office space leases occupied by City staff in downtown San Diego, the City recognized that 49 percent of its then-current leases would expire within the next five years, and that lease rates were then increasing due to demand and a lack of development of office space.  As a result, the City began focusing on long-term solutions to control its office space expenses including office ownership, purportedly to "minimize the negative effects of being subject to real estate conditions outside the City's control, with the ultimate goal of saving taxpayer's money."  As one example of its focus, in March 2015, the City entered into a lease-to-own arrangement[2] for an office building at Civic Center Plaza (CCP), located at 1200 Third Avenue and 201 A Street.  Under this arrangement, the landlord acquired CCP through a loan funded by the lender of CCP, and the City then

---

[2]     Lease-to-own agreements are sometimes used by local governments to acquire and use real property.  One of the attributes of such agreements is that they avoid the necessity of voter approval for such acquisitions, as required by article 16, section 18, subdivision (a) of the California Constitution, which provides in pertinent part: "No . . . city . . . shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters of the public entity voting at an election to be held for that purpose."  (Cal. Const., art. XVI, § 18, subd. (a).)  Our Supreme Court has concluded that a long-term, lease-to-own agreement would not violate this provision "so long as liability for each individual rent payment is contingent" on the locality's use of the leased property during the corresponding rental period, or on "receipt of some additional, contemporaneous consideration."  (*Rider v. City of San Diego* (1998) 18 Cal.4th 1035, 1047, 1049, citing *Doland v. Clark* (1904) 143 Cal. 176, 181.)

entered into a lease agreement with the landlord and made payments directly to the lender.

B. *The City's Lease of the Ash Street Property*

Since about 2013, the City had engaged Jason Hughes as a "volunteer Special Assistant for Real Estate Services" and had "authorized him to advise [the City] on leasing strategies, negotiate with its potential landlords and property sellers, and represent it in negotiating the terms of any contract or lease for its downtown San Diego office needs." Ultimately, Hughes's role included his involvement in the events and transactions leading to the City's Lease of the Ash Street Property.

Prior to the Lease with the City, the Ash Street Property was owned and operated by "entities controlled" by Sandor Shapery (Shapery) and Douglas Manchester (Manchester), specifically, The Gas & Electric Headquarters Building—San Diego, L.P., and Shapery Developers Gas & Electric Property, L.P. (the Manchester and Shapery entities). Hughes engaged in "protracted negotiations" with Shapery and Manchester over the lease or sale of the Ash Street Property to the City. When a deal could not be reached, Hughes commenced negotiations with Cisterra Partners, LLC (Cisterra) on the City's behalf regarding a lease-to-own plan that the City would approve if Cisterra could acquire the Ash Street Property.

In July 2016 the City executed a "letter of intent with Cisterra expressing an intention to enter into a lease-to-own arrangement" for the Ash Street Property. In October 2016, Cisterra pitched the proposed transaction to the City Council; Hughes attended the meeting as the City's representative.

In anticipation of the Lease with the City, Cisterra created a limited liability company, defendant 101 Ash, LLC (Landlord). As an underlying

4

transaction related to the Lease, the Manchester and Shapery entities sold the Ash Street Property to Landlord for $72.4 million.

To purchase the Ash Street Property from the Manchester and Shapery entities, Landlord borrowed $91,793,022.12[3] from defendant Wilmington Trust, National Association, as trustee for the registered certificate holders of the CGA Capital Credit Lease-Backed Pass-Through Trust, Series 2017-CTL-1, a Maryland-based provider of private capital (Lender).  Landlord executed a promissory note in the same amount, secured in part by a "Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing" in favor of Lender.  As a condition of obtaining the loan, Landlord assigned and granted Lender a security interest in the Lease, and directed the City to remit to Lender all payments of rent and all other sums the City owed under the Lease.  The City subsequently learned that the closing transactions for the Ash Street Property included a transfer to Hughes (the "volunteer Special Assistant for Real Estate Services") of $4.41 million from Cisterra and/or 101 Ash LLC.

Landlord and the City entered into the Lease in mid-November 2016. The City agreed to lease the Ash Street Property "as is" for a 20-year term, with the option to acquire the Ash Street Property from Landlord (Cisterra's LLC) when the Lease ended.  The Lease was authorized by San Diego Municipal Ordinance Number 0-20745, passed by the city council on November 15, 2016, and approved by then Mayor Kevin Faulconer on

---

[3]    According to the Gordon's complaint, "Cisterra passed $19.5 million in costs on to City . . . , making the total acquisition price of [the Ash Street Property] to the City approximately $92 million."

November 17, 2016.  The Lease was slated to become effective on January 3, 2017, without a vote of the electorate.

In sum, the Manchester and Shapery entities sold the Building to a limited liability company created by Cisterra (101 Ash, LLC, Landlord), who paid for the property with a loan from Lender (Wilmington Trust).  101 Ash, LLC then leased the Building to the City, with instructions that the City's rent payments would go to Lender.

1.  Rent

Under the Lease, the City, as Tenant, agreed to pay the base monthly rent of $534,726.50 as well as "Additional Rent," which the Lease defined as any cost incurred by Landlord in curing any failure by the City to maintain the Ash Street Property under the Lease.

Section 4(e) of the Lease provided:  "Tenant hereby certifies to Landlord that Tenant has fully investigated options and alternatives to the lease of the Premises, including rental rates, terms and conditions, and has utilized the services of commercial real estate leasing professionals familiar with local market conditions and that, as of the Effective Date of this Lease, the total Rent during any twelve (12)-month period during the Term . . . is not in excess of the total fair rental value of the Premises."

2.  Environmental

Section 6(b) of the Lease provided that the City, at its sole expense, would ensure the Ash Street Property complied with all environmental laws, including those related to hazardous materials such as "asbestos" and "asbestos-containing materials and/or products."  Section 6(c) further provided that, if, at any time during the 20-year Lease period, "Hazardous Materials" were found to have been "released, placed, stored, brought onto, into or under the Premises" by the City (including its contractors), then the

6

City, at its "sole expense," would "promptly commence and diligently prosecute to completion all investigation, site monitoring, containment, cleanup, removal, restoration or other remedial work of any kind or nature . . . to the extent required" under the Lease.

Section 6(c)(ii) provided that the City would "be solely responsible for and to the maximum extent permitted by law [would] defend, reimburse, indemnify, and hold Landlord . . . harmless from and against all demands, claims, actions, causes of action . . . [and] losses . . . arising out of" "(A) Tenant's obligations in this Lease, (B) The occurrence of any regulated activity at, on or under the Premises at any time, (C) Any environmental claim with respect to the Premises . . . , (D) The release, threatened release or presence of any hazardous materials at, on, under or from the premises by a tenant-responsible party or any third-party before or during the term of this Lease . . . , (E) Any remedial work required to be performed pursuant to any environmental law or the terms hereof . . . during the [Lease] term, or (F) Any matters arising under or relating to any environmental law and relating to the tenant or the Premises." (Bold and all capitalization omitted.)

3. Rent Abatement

Section 11(a) provided for rent abatement if, prior to the termination of the Lease, the Ash Street Property was subject to "(i) an event of loss, damage or destruction, whether by fire or hazard or other casualty to all or a portion of the Premises . . . caused by a peril that was or should have been covered by insurance"; or (ii) a taking by "any actual or threatened eminent domain proceeding . . . by any governmental authority."

Section 11(i) further provided in part: "If, during any period in which, by reason of an event of Destruction [as defined in section 11(a)], there is substantial interference with the use and occupancy by Tenant of any portion

of the Premises, payments of Base Rent due hereunder with respect to the Premises shall be abated to the extent that the annual fair rental value of the portion of the Premises in respect of which there is no substantial interference is less than the annual Base Rent payments and Additional Rent, in which case rental payments shall be abated only by an amount equal to the difference."

4. Additional Provisions

Section 13 provided that, at the end of the Lease, in consideration of the City's full performance of its obligations, Landlord shall convey to the City fee title to the Ash Street Property.

Section 30 provided that in return for payment of rent, Landlord would not do "any act to disturb, or fail to perform any act which failure results in the disturbance of, the peaceful and quiet occupation and enjoyment of the Premises" by the City.

C. *Renovation and Occupancy of the Ash Street Property*

The City did not immediately occupy the Ash Street Property once it took possession in January 2017. Instead, the city council authorized the City to engage contractors to remodel the Ash Street Property to "maximize the efficiency of the building." Once completed, the City estimated the Building could accommodate approximately 1,100 City employees. In August 2018, the city council authorized the expenditure of no more than $25,880,410 for the tenant improvements. At some point during the remodel, City employees began to occupy the Building.

On August 14, 2019, the San Diego County Air Pollution Control District (APCD) issued a notice of violation to the City for its "[f]ailure to remove all Regulated Asbestos-Containing Material (RACM) from [the Building] being renovated before starting any activity that would break up,

8

dislodge, or disturb RACM. Specifically, disturbed RACM from construction activity was found on various floors inside the Building." The City was given 10 business days to correct the alleged violations or explain why it believed the violations were unfounded. APCD subsequently issued similar notices of violation to the City on January 16, 17, and 28, 2020. As a result of the notices of violation, APCD declared that the City had created a public nuisance stemming from the release of asbestos during the Building's remodel.

In late January 2020, the City removed all of its employees from the Ash Street Property. In September 2020, the City notified Landlord that it would discontinue paying rent because it could not use the Ash Street Property for the purposes intended "due, in part, to direct physical loss and damage to the premises, including from widespread and negligent disturbance of asbestos." The City also stated it was investigating whether the Lease complied with state law, including the constitutional debt limitation provision in article 16, section 18, subdivision (a). (Cal. Const., art. XVI, § 18, subd. (a) (Section 18(a)).)

D. *The City's Lawsuit*

In October 2020, the City filed a lawsuit against Lender and Landlord. (*City of San Diego v. 101 Ash, LLC et al.*, case No. 37-2020-00036247-CU-CO-CTL) (City Lawsuit).) In January 2021, Landlord and Lender filed cross-complaints against the City, and Lender also filed a cross-complaint against the City's contractors and subcontractors, who in turn filed their own cross-complaints.

In August 2021, the City filed a first amended complaint against Lender, Landlord, various contractors and subcontractors, and other defendants including Cisterra, Hughes, and Hughes Marino, Inc., a

9

California corporation (Hughes Marino). When the City filed its amended complaint, it had paid Lender 44 months of rent under the Lease, totaling $23,527,966.

In its first and fourth causes of action against Cisterra, Landlord, and Hughes, the City alleged a violation of Government Code section 1090 et seq. as a result of Hughes's purported undisclosed financial interest in the Ash Street transaction, including his receipt of $4.41 million from Cisterra and/or Landlord, and fraud/concealment, respectively. In its second and third causes of action against Hughes, the City alleged causes of action for fraud/intentional misrepresentation and breach of fiduciary duty, respectively. In its fifth and sixth causes of action, the City sought the return of all money it had paid as a result of the Lease being void under Government Code section 1090 et seq. and Civil Code section 1688 et seq., respectively; and in its seventh and eighth causes of action, the City sought declaratory relief and reformation of the Lease, respectively, based on Section 18(a).

Specifically, the City in its seventh cause of action alleged that an event of loss, damage, or destruction had occurred on the Ash Street Property which "has resulted in substantial interference with the use and occupancy by the City of the premises, such that the City is not able to occupy any portion of the premises as envisioned by the . . . Lease"; that the "premises are therefore unusable for the purposes intended and thereby confer no value to the City"; that an actual controversy existed between the City, on the one hand, and Lender and Landlord, on the other hand, over whether the City is "entitled to rent abatement" under the Lease for the period it is unable to occupy the Ash Street Property; and that, to the extent Lender and Landlord continued to demand that rent be paid despite the City's inability to use and occupy the Ash Street Property, the payments would be in violation of

10

Section 18(a) because they were "not 'contingent on receipt of some additional, contemporaneous consideration, such as the [the City's] ongoing use and occupancy of the building.'"

In the eighth cause of action, the City sought judicial reformation of the Lease to the extent it did not permit rent abatement. Under that circumstance, the City alleged that the parties had "made a mutual mistake when reducing the agreement to writing in drafting an impermissibly narrow abatement provision," and that the Lease therefore did "not truly express the intention of the parties." The City requested the Lease be reformed to "include a provision that permits abatement of rent where City is not able to occupy the Premises as envisioned by the . . . Lease."

E. *Settlement of the City Lawsuit and Termination of the Lease*

On July 28, 2022, Lender, Landlord, the City, and Cisterra entered into the Settlement Agreement resolving the City Lawsuit as to these parties.[4] As relevant here, under the Settlement Agreement the City acquired fee ownership of the Ash Street Property in return for a payment equal to the outstanding balance on the loan, which the parties then estimated to be about $86 million; the City agreed to take the Ash Street Property in its "as-is, where-is condition, without representation or warranty"; the Lease terminated with "no further force or effect"; and Cisterra agreed to pay the City $7,452,500.

---

[4] Although not the subject of this appeal, the City Lawsuit proceeded against the remaining defendants. In addition, the Settlement Agreement also resolved a separate suit the City had brought involving the 2015 CCP transaction, which suit is also not the subject of this appeal. (*City of San Diego v. CCP 1200, LLC, et al.* case No. 37-2021-00028026-CU-FR-CTL.)

## F.  *Gordon's Lawsuit*

Meanwhile, in August 2020 (two months prior to the City Lawsuit), Gordon filed the instant taxpayer action against Landlord and others pursuant to Code of Civil Procedure section 526a,[5] alleging claims for fraudulent and negligent misrepresentation, and waste of public funds and resources.  Gordon never served the original complaint.

In December 2020, Gordon filed a first amended complaint (FAC)—the operative pleading in this case —against the City, Lender, and Landlord (Defendants).  His first cause of action against Defendants sought a declaration that the Lease was void under Section 18(a) because it "obligated revenues and the payments without a contemporaneous contingent benefit of consideration."  His second cause of action, also premised in part on Section 18(a), sought a judgment "restraining and preventing any illegal expenditure or waste of public funds regarding [the Ash Street Property]."  His third and fourth causes of action, against Lender and Landlord, respectively, sought disgorgement of public funds each received from the City under the Lease.

In support of his causes of action in the FAC, Gordon alleged Landlord in 2016 presented to City a "Property Condition Report" for the Building.  The report described the Building as being well-maintained and in good condition, with an "estimated remaining useful life of 'at least an additional 40 years barring any natural disasters,' " and requiring only an expenditure of "$10,000 to clean, caulk and pressure wash the exterior of the building."

---

5      Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

Gordon alleged that, in fact, the Ash Street Property suffered from a lack of proper maintenance and/or deferred maintenance affecting safe occupancy; that the previous owners were aware of the deferred maintenance and unsafe conditions; that the Building would require extensive remediation and repair; that representations to the contrary Cisterra made to the City were knowingly false; and that the City would need to expend tens of millions of dollars in repairs and it would take years of work before the City could safely occupy the Ash Street Property. "As a result of these misrepresentations, the City of San Diego was in fact unable to safely occupy [t]he [Ash Street Property] under the [Lease]."

Gordon further alleged that the "functional obsolescence" of the Building included "a need for asbestos abatement," at an estimated cost between $16 million and $25 million; that in November 2014, "SDG&E representatives . . . disclosed to State regulators [t]he [Ash Street Property] had major defects," including asbestos containment that suffered from "old age and lack of maintenance"; and that in 2020, outside experts hired by the City "confirmed that the asbestos containment, which date[d] back to original construction, [had] also exceeded its reasonably expected useful life necessitating abatement costs in excess of $20 million to make the building capable of safe occupancy for the next 40 years."

Gordon also alleged that because the Building was unusable for all practical purposes, and therefore the City was not receiving any actual consideration for the Lease, the Lease violated Section 18(a) and should be deemed void, and the City should be restrained from paying any further rent.

13

G. *Summary Judgment/Adjudication*

    1. Lender

Prior to the execution of the Settlement Agreement in the City Lawsuit, Lender moved for summary adjudication on all of Gordon's claims.[6] The trial court granted the motion, ruling that the Lease was a "permissible contingent obligation" that satisfied Section 18(a); and that as a result, all of Gordon's claims against Lender failed as a matter of law.

    2. The City

Following execution of the Settlement Agreement, the City moved for summary judgment in the instant case. The trial court granted the City's motion, ruling Gordon's first and second causes of action were moot because his lawsuit sought to "adjudicate the validity of an agreement which has been terminated by the parties to that agreement." The court rejected Gordon's contention that the action was not moot because the Settlement Agreement itself was void, finding there was no evidence to support this contention and, in any event, to challenge the Settlement Agreement under Section 18(a) would necessarily give rise to a new action.

The trial court also rejected Gordon's contention that his claims against the City were not moot because there remained an active disgorgement claim, noting those claims were only against Landlord and Lender; and his contention that the mootness doctrine did not apply because there was a " 'reasonable expectation there will be similar lease financings that raise the

---

[6]    Lender's motion was for summary adjudication and not summary judgment because of Lender's pending cross-complaint against the City for indemnification. Lender subsequently dismissed that cause of action pursuant to the Settlement Agreement.

same . . . Section 18 compliance issues" as the instant case, finding that claim to be speculative.

### 3. Landlord

In December 2022, Landlord moved for summary adjudication. Similar to its ruling for the City, the trial court granted Landlord's motion in its entirety, finding Gordon's first and second causes of action were moot as a result of the Settlement Agreement; and his fourth "cause of action" for disgorgement was barred because the Lease was neither unconstitutional nor illegal. The court thus found its ruling granting summary adjudication of all claims equated to an order granting summary judgment, and entered judgment for Landlord.

## DISCUSSION

### I.

### Summary Judgment/Adjudication

" 'Summary adjudication motions are "procedurally identical" to summary judgment motions. [Citation.] A summary judgment motion "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [Citation.] To be entitled to judgment as a matter of law, the moving party must show . . . that the "action has no merit or that there is no defense" thereto. [Citation.] . . . Material facts are those that relate to the issues in the case as framed by the pleadings. [Citation.] There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Duffey v. Tender Heart Home Care Agency, LLC* (2019) 31 Cal.App.5th 232, 240–241 (*Duffey*).)

15

" 'The trial court's ruling on a motion for summary adjudication, like that on a motion for summary judgment, is subject to [our] independent review' " (*Duffey, supra,* 31 Cal.App.5th at p. 241); and we are not bound by the trial court's stated reasons or rationale (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1001 (*Hersant*)). We do not weigh evidence, but instead consider whether it creates a triable issue of fact. (*Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 113.)

In reviewing summary judgment, we typically view the evidence in a light favorable to the losing party. (See *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768–769.) In contrast, whether a cause of action or action is moot involves questions of law on undisputed facts, which we review de novo. (See *Robinson v. U-Haul Co. of California* (2016) 4 Cal.App.5th 304, 319 (*Robinson*) ["Issues of justiciability, such as mootness, are generally reviewed de novo."]; see also *K.G. v. Meredith* (2012) 204 Cal.App.4th 164, 174 ["Trial court rulings on mootness are reviewed de novo where . . . they are decided on undisputed facts."].)

## II.

### Mootness

A. *Gordon's First and Second Causes of Action Are Moot*

1. Guiding Principles

It is axiomatic that courts only decide justiciable issues. (§ 1060 [providing in part that a person "interested under a written instrument, excluding a will or a trust," "who desires a declaration of his or her rights or duties with respect to another, or in respect to, in, over or upon property, . . . , may, in cases of *actual controversy* relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties in the

16

premises, including a determination of any question of construction or validity arising under the instrument or contract" (italics added)].)

Justiciability means the questions litigated are based on an actual controversy. (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1574 (*Wilson & Wilson*).) Mootness occurs when a once ripe actual controversy no longer exists due to a " 'change in circumstances.' " (*Ibid.* [noting " 'ripeness is not a static state' "].) "[A]lthough a case may originally present an existing controversy, if before decision it has, through act of the parties or other cause, occurring after the commencement of the action, lost that essential character, it becomes a moot case or question which will not be considered by the court." (*Wilson v. Los Angeles County Civil Service Com.* (1952) 112 Cal.App.2d 450, 453 [dismissing action challenging the validity of civil service eligibility list that had expired and been replaced by a new list]; see *Wilson & Wilson*, at p. 1574 [the completion of a redevelopment project in the city rendered the landowner's challenge to the project moot].) "Issues of justiciability, such as mootness, are generally reviewed de novo." (*Robinson*, *supra*, 4 Cal.App.5th at p. 319.)

2. Analysis

As summarized *ante*, Gordon's first and second causes of action are premised on the *existence* of the Lease; namely whether it satisfied the constitutional debt limitation in Section 18(a), and whether it constituted

17

waste.[7]  However, once Defendants' entered into the Settlement Agreement in the City Lawsuit and the Lease ceased to have any "force or effect," both causes of action became moot.  (See *San Diegans for Open Government v. Public Facilities Financing Authority of City of San Diego* (2021) 63 Cal.App.5th 168, 183 [the plaintiff's challenge to a cooperation agreement between the city and a private party for improvements to Balboa Park was moot because the party *terminated* that agreement during the appeal]; *Pittenger v. Home Sav. & Loan Ass'n of Los Angeles* (1958) 166 Cal.App.2d 32, 37 [the plaintiffs' declaratory relief cause of action against the defendant who formerly held a note executed by the plaintiffs secured by a deed of trust, which the defendant transferred for full value to another mortgage company after the commencement of suit, mooted the plaintiffs' action because they were "seek[ing] a determination of rights as against [the defendant] under a *contractual relationship which has become nonexistent*" (italics added)].)

"When events render a case moot, the court, whether trial or appellate, should generally dismiss it." (*Wilson & Wilson, supra,* 191 Cal.App.4th at p. 1574.)  This is because courts are "tasked with the duty ' "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." ' " (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*In re D.P.*); accord, *Center*

---

7      "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax that funds the defendant local agency" including "[a]n income tax."  (§ 526a, subd. (a)(1).)

*for Local Government Accountability v. City of San Diego* (2016) 247 Cal.App.4th 1146, 1157 [" 'The policy behind a mootness dismissal is that "courts decide justiciable controversies and will normally not render advisory opinions." ' "]; *Jennings v. Strathmore Public etc. Dist.* (1951) 102 Cal.App.2d 548, 551 [citizen's suit to enjoin the construction of a sewer system was moot because a "decision as to the validity of the contracts, . . . after the work has been completed and after the payments have been made and where no relief, under the complaint could be afforded plaintiff, would be purely academic and would serve no useful purpose"].)

In the instant case, Gordon's first cause of action asks the court to deem the Lease void, and the second cause of action asks the court to restrain the City from further payments under the Lease. But as a result of the settlement of the City Lawsuit, the Lease terminated and the City was no longer obliged to make any further payments. Thus, these causes of action became moot upon termination of the Lease, as there is no longer any controversy on which "effectual relief" can be granted. (See *Wilson & Wilson*, *supra*, 191 Cal.App.4th at p. 1574 ["The pivotal question in determining if a case is moot is . . . whether the court can grant the plaintiff any effectual relief."]; accord, *Citizens for the Restoration of L Street v. City of Fresno* (2014) 229 Cal.App.4th 340, 362 ["An appeal is moot if the appellate court cannot grant practical, effective relief."].) We thus independently conclude summary adjudication was properly granted as to Defendants on Gordon's first and second causes of action.

19

B. *The Exceptions to the Mootness Doctrine Do Not Apply*

Gordon nonetheless contends his first and second causes of action are not moot because the City's payment of the loan " 'in full' " under the Settlement Agreement "compounded the violation of [Section 18(a)] meant to protect municipal taxpayers."

Critically for this issue, Gordon's FAC does not include any allegations that the Settlement Agreement, as opposed to the Lease, violated Section 18(a), nor does it appear from the record that Gordon sought to amend his complaint to add such allegations. (See *Frittelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 41 ["In assessing the propriety of summary judgment, we look first to . . . [the] allegations in the operative complaint, which frame the issues pertinent to a motion for summary judgment."]; accord, *Ahn v. Stewart Title Guaranty Co.* (2023) 93 Cal.App.5th 168, 181 ["the pleadings frame the issues on a motion for summary judgment"].) Thus, the issue of whether the Settlement Agreement violated Section 18(a) was not before the trial court and it is not before us.

In support for his argument that his first and second causes of action are not moot because the Settlement Agreement compounded the violation under Section 18(a), Gordon relies on *Starr v. City and County of San Francisco* (1977) 72 Cal.App.3d 164 (*Starr*), arguing the Court of Appeal there found a "settlement repayment contract violated . . . Section 18 because payments were not made in consideration for [the] use and occupancy of the premises, just as in this case." We conclude *Starr* is inapposite and provides no meaningful guidance in our case.

First, *Starr* had nothing to do with justiciability.

Second, *Starr* is factually distinguishable from the instant case in that the settlement agreement between the San Francisco Redevelopment Agency,

and a taxpayer who challenged a financing agreement for the construction of a project, *predated* additional provisions that were added to the financing agreement about a year later. (*Starr*, *supra*, 72 Cal.App.3d at p. 178.) The *Starr* court concluded it was these additional provisions—and not the original lease between the city and the agency, *or* the settlement agreement between the agency and the taxpayer—that violated Section 18(a).[8] (*Starr*, at p. 178.) Thus the settlement agreement at issue in *Starr*, which, in any event, was the result of the taxpayer's challenge to the *scope* of the construction project and not to its financing, had absolutely nothing to do with the court's holding in that case.

Gordon alternatively contends his first and second causes of action are justiciable because the issue of the validity of the Lease "is likely to repeat, injuring taxpayers down the road." In support, he cites *Southern Counties Gas Co. v. Ventura Pipeline Constr., Co.* (1971) 19 Cal.App.3d 372 (*Ventura Pipeline*) among similar authorities.

In *Ventura Pipeline*, the plaintiff utility company sought about $1,000 in damages from the defendant for repairs the plaintiff made to underground pipeline installed by the defendant. The plaintiff alleged the pipeline lacked a protective coating as required under the parties' contracts, causing it to corrode and leak natural gas; and sought declaratory relief to determine the

---

[8]     The added provisions required the city to repay from its general funds that portion of the outstanding indebtedness the agency owed the United States Department of Housing and Urban Development (HUD) under a loan HUD had made to the agency that went toward the construction project. (*Starr*, *supra*, 72 Cal.App.3d at p. 173.) The *Starr* court found these provisions violated Section 18(a) because none of the city's payments to HUD on behalf of the agency could "be credited toward the [c]ity's rental obligations" under the valid project lease. (*Ibid.*)

parties' respective rights. (*Ventura Pipeline*, *supra*, 19 Cal.App.3d at pp. 376–377.) The dispute centered on whether the superior court had authority to grant declaratory relief and thus retain jurisdiction of the matter, or whether the matter should have been transferred to what was then the municipal court, because the amount in controversy was less than $5,000. (*Id.* at p. 377.)

*Ventura Pipeline* held the trial court acted properly in granting declaratory relief for the plaintiff because there was a present controversy between the parties regarding who was responsible for the costs to repair the underground pipes when they leaked. (*Ventura Pipeline*, *supra*, 19 Cal.App.3d at p. 377.) In reaching its decision, the *Ventura Pipeline* court recognized the plaintiff had not only presented a claim for the costs to make repairs for corrosion damage "previously discovered, but also [for] the prospect, if not the likelihood, that additional incidents will continue to reoccur." (*Id.* at p. 381.) The court noted that the defendant had installed "thousands of feet" of underground pipeline which could not be readily inspected (*ibid.*); that there already had been "several instances" where the failure to apply protective coating had caused the pipeline to leak (*id.* at p. 376); and that it typically took three to five years for gas leaks to become noticeable (*id.* at p. 379). The court thus concluded the matter was not moot, as it presented " 'a continuing controversy ripe for decision' " because there was a " 'reasonable expectation that the wrong [if any] will be repeated' " by future gas leaks from corroded pipeline. (*Id.* at p. 381.)

The facts of *Ventura Pipeline* are vastly different from those in the instant case. Unlike here, there was substantial evidence in *Ventura Pipeline* that the "wrong"—the failure of the defendant to put a protective coating on thousands of feet of underground pipeline it installed—was likely to recur,

22

given that the plaintiff already had repaired "several" gas leaks due to corrosion. In contrast, there is no evidence of a "reasonable expectation" that the "wrong" here—a public entity subject to Section 18(a) entering into a leasing arrangement involving a building with significant environmental problems, with terms restricting rent abatement—"will be repeated." (See *Ventura Pipeline, supra*, 19 Cal.App.3d at p. 381.) In short, allegations of "speculative future harm" are not "sufficient to avoid mootness." (*In re D.P.*, *supra*, 14 Cal.5th at p. 278.)

Pivoting, Gordon next contends the validity of the Lease "presents a question of continuing importance in local public finance," and therefore requests that we exercise our "inherent discretion" to resolve that issue even if it is moot. Under the so-called public importance exception to the mootness doctrine, " '[i]f an action involves a matter of continuing public interest and the issue is likely to recur, a court may exercise [its] inherent discretion to resolve that issue, even though an event occurring during its pendency would normally render the matter moot.' " (*Giraldo v. Department of Corrections & Rehabilitation* (2008) 168 Cal.App.4th 231, 259.)

As we have stated, whether a future lease-to-own arrangement would violate the constitutional debt limitation provision of Section 18(a) will undoubtedly turn on unique facts and circumstances that have yet to occur. (See *Giles v. Horn* (2002) 100 Cal.App.4th 206, 228 [reversing as moot the trial court's ruling that the County of San Diego violated the County Charter by hiring private contractors to provide services under a California welfare-to-work program because the relevant contracts had expired, and declining to apply the public importance exception to the mootness doctrine because the plaintiffs' claim involved a "particularly factual determination that must be resolved on a case-by-case basis, dependent upon the specific facts of a given

23

situation," and therefore it was "not one on which we would exercise our discretion to address on the merits, despite the fact it is moot"].) We therefore decline to exercise our discretion to resolve this mooted issue, as we are not persuaded that the issue here is a significant one that is likely to recur and evade review.

III.

Summary Adjudication Was Proper on the Third and Fourth "Causes of Action" for Disgorgement

Gordon's third and fourth causes of action against Lender and Landlord, respectively, seek disgorgement of money each received from the City under the former Lease. However, disgorgement is a remedy, not a type of injury or wrong: "There is a 'basic distinction . . . between the cause of action (the primary right and duty, and the violation thereof) and the remedy or relief sought.' (4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 30, p. 92.) 'The gravamen, or essential nature . . . of a cause of action is determined by the primary right alleged to have been violated, not by the remedy sought.' [Citations.]" (*Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518, 1535, 1536 (*Slovensky*) [concluding "[d]isgorgement of attorney's fees is a *remedy* sought by plaintiff," and therefore her "general prayer for 'such other and further relief as the Court may deem proper' was sufficient to plead entitlement to disgorgement as a remedy"].)

Although the trial court ruled Gordon's third and fourth causes of action were subject to summary adjudication because the Lease was neither unconstitutional nor illegal, we are "not bound by the trial court's stated reasons or rationale." (*Hersant, supra*, 57 Cal.App.4th at p. 1001; accord, *Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 951 ["An appellate court is not bound by the trial court's stated reasons, if any,

24

supporting its ruling; we review the ruling, not the rationale."].) Instead, we independently conclude that summary adjudication was properly granted on these causes of action because Gordon's first and second causes of action are moot, and therefore there is no remaining injury or wrong in the FAC to support disgorgement. (See *Slovensky*, *supra*, 142 Cal.App.4th at p. 1535.)[9]

---

[9] In light of our decision, we deem it unnecessary to address other issues raised by the parties, including whether (i) the Lease complied with Section 18(a) and/or the City acted in "good faith," for purposes of this provision, when it entered into the Lease; and (ii) Gordon had taxpayer standing to maintain this action, both at its commencement and/or after the City filed its own lawsuit seeking similar relief under Section 18(a). (See *Wolf v. CDS Devco* (2010) 185 Cal.App.4th 903, 916 ["A plaintiff may lose standing even where an actual controversy originally existed 'but, by the passage of time or a change in circumstances, ceased to exist.' "].) Finally, we deny Gordon's opposed request for judicial notice of three documents: (1) the text of Government Code section 1090; (2) the criminal misdemeanor complaint against Hughes filed in March 2023; and (3) Hughes's resulting guilty plea, as we conclude none are relevant to our decision. (See *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [declining to take judicial notice of materials that are not "necessary, helpful, or relevant"].)

DISPOSITION

The judgments for the Lender, Landlord, and the City are affirmed. Defendants are entitled to their respective costs on appeal.  (See Cal. Rules of Court, rule 8.278(a)(1).)


KELETY, J.

WE CONCUR:


HUFFMAN, Acting P. J.


CASTILLO, J.